UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE CHIN**

**05 CV 4720**

| | |
|---|---|
| SAN FRANCISCO EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | : Case No. _____ |
| | : |
| Plaintiffs, | : CLASS ACTION    **ECF CASE** |
| | : |
| vs. | : COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| | : |
| AMERICAN INTERNATIONAL GROUP, INC., C.V. STARR & CO., INC., STARR INTERNATIONAL INC., GENERAL REINSURANCE CORPORATION, MAURICE GREENBERG, HOWARD SMITH, CHRISTIAN MILTON, and L. MICHAEL MURPHY, | : DEMAND FOR JURY TRIAL |
| | : |
| Defendants. | : |



RECEIVED
MAY 16 2005
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE CHIN**

**05 CV 4720**

Case No. _____

---

SAN FRANCISCO EMPLOYEES'
RETIREMENT SYSTEM, individually and on
behalf of all others similarly situated,

Plaintiffs,

vs.

AMERICAN INTERNATIONAL GROUP, INC.,
C.V. STARR & CO., INC., STARR
INTERNATIONAL INC., GENERAL
REINSURANCE CORPORATION, MAURICE
GREENBERG, HOWARD SMITH, CHRISTIAN
MILTON, and L. MICHAEL MURPHY,

Defendants.

---

CLASS ACTION      **ECF CASE**

COMPLAINT FOR VIOLATION OF
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL



MAY 1 6 2005

U.S.D.C. S.D. N.Y.
CASHIERS

## TABLE OF CONTENTS

Page

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                1.      Aiding and Abetting/Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                2.      Unnamed Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.      FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      The Corporate Culture At AIG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      AIG's Arrangements With Starr Entities . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.      The Pervasive Accounting Improprieties . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                1.      Use Of Offshore, AIG Affiliates To Manipulate Financial Statements . . 15

                2.      AIG's Sham Reinsurance Deal With General Re . . . . . . . . . . . . . . . . . . 17

                3.      Covered Calls On Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                4.      Misstated Accounting Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        D.      Defendants Conceal Accounting Improprieties And Misstate AIG's Financial
                Condition In Public Reports, Filings And Statements . . . . . . . . . . . . . . . . . . 21

        E.      Securities Regulators Subpoena AIG's Records . . . . . . . . . . . . . . . . . . . . . . . 32

        F.      The Accounting Fraud Is Finally Revealed To The Market . . . . . . . . . . . . . . 34

        G.      Violations of Accounting Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

VI.     SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VII.    CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        JURY TRIAL DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Plaintiff San Francisco Employees' Retirement System ("Plaintiff" or "SFERS"), individually and on behalf of all those similarly situated, allege the following based upon the investigation of plaintiffs and their counsel, including a review of regulatory investigations, regulatory filings, reports, press releases and media reports.

## I.    INTRODUCTION

1.    This is a class action on behalf of persons who purchased securities of American International Group, Inc. ("AIG") between October 1, 1999 and March 30, 2005 (the "Class Period") arising out of defendants' dissemination of false and misleading statements concerning the Company's financial condition and accounting practices relating to, among other items, non-traditional insurance products, assumed reinsurance transactions, and use of affiliated entities for executive compensation.

2.    What once began as a government investigation by the Office of the Attorney General for the State of New York ("NYAG") and the Securities and Exchange Commission ("SEC") into two reinsurance transactions by which defendants tried to hide liabilities from investors has now mushroomed into AIG's recent *admission* of *pervasive* accounting irregularities and conflicts of interest infecting its business.

3.    On March 30, 2005, AIG issued a press release and *admitted* that it had improperly entered into "*transactions which appear to have been structured for the sole or primary purpose of accomplishing a desired accounting result.*"   The transactions included a sham reinsurance deal set up with defendant General Reinsurance Corporation solely to bolster reserves; transactions with supposedly independent companies that were in fact controlled by AIG; bond transactions that allowed AIG to claim gains without actually selling the bonds; mis-

1

classified losses; and questionable estimates on deferred acquisition costs. AIG conceded that its
net worth would have to be *reduced by $1.7 Billion*.

      4.      In response to this news, AIG's stock value plunged. Between February 14, 2005,
when AIG first disclosed that it had received subpoenas from the SEC and NYAG, and April 1,
2005, after AIG startling admissions, AIG's share value fell approximately 30%. The damages
of plaintiffs and other Class members exceeded $50 billion.

      5.      Remarkably, rather than cooperate with regulatory investigations to ensure that all
material information was finally revealed to the public markets, defendants have resisted
discovery, destroyed evidence, and engaged in blatant efforts to shield personal assets. This
includes the efforts of defendant Maurice "Hank" Greenberg, the former CEO and Chairman of
AIG, who *personally* negotiated some of the very deals now acknowledged to be a sham.

      6.      On March 25, 2004, the same day that the SEC issued subpoenas for AIG
documents, lawyers representing Greenberg and his controlled companies, defendants Starr
International Inc. and C.V. Starr & Co., reportedly removed 87 boxes of documents from AIG's
Bermuda offices that also are occupied by Starr officials. The Starr companies were used by
Greenberg to provide millions of dollars in compensation to AIG executives, and were known to
be under government scrutiny. Responding to the removal of documents, federal authorities
were forced to take the unusual step of securing a court order securing the documents of
Greenberg, AIG and C.V. Starr and barring their destruction during the probe.

      7.      On Sunday, April 10, 2005, Attorney General Eliot Spitzer, who had subpoenaed
AIG records, appeared on a national news program on ABC and said that Greenberg had misled
the public about AIG's dealings, "That company was a black box run with an iron fist by a CEO
who did not tell the truth. That is the problem. . . . We have powerful evidence, and will proceed

with it. . . . The evidence is overwhelming that these were transactions created for the purpose of deceiving the market. We call that fraud. It is deceptive. It is wrong. It is illegal."

8.      Two days later, on April 12, 2005, Greenberg appeared to be interviewed by government investigators but refused to answer questions and invoked the 5th Amendment to avoid self-incrimination, following the lead of defendants Howard Smith, Christian Milton and Michael Murphy. That same day, Greenberg filed a Form 4 with the SEC revealing that he had gifted his wife 41.4 million shares of AIG, representing 95% of his personal stake. The gift was valued at $2.68 billion on the day of the transaction.

9.      On May 1, 2005, AIG announced that it needed to restate its financial statements for the years ended December 31, 2003, 2002, 2001 and 2000, the quarters ended March 31, June 30, and September 30, 2004 and 2003, and the quarter ended December 31, 2003, and that its prior financial statements for those periods should no longer be relied upon. AIG also announced that its consolidated shareholders' equity would be reduced by approximately *$2.7 billion* – or $1 billion more than previously announced – due to accounting errors and internal control deficiencies.

10.     By this action, plaintiff seeks to recover lost funds for the victims of these improper accounting schemes.

## II.    JURISDICTION AND VENUE

11.     Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. This Court has jurisdiction of this action pursuant to Section 27 of the 1934 Act, 15 U.S.C. §78aa. Venue of this action is proper in this Court pursuant to Section 27 of the 1934 Act. The subject acts and transactions occurred in this district.

3

12.     Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities or the national securities markets in connection with the acts, conduct, and other wrongs complained of herein.

## III.   THE PARTIES

### A.   Plaintiff

13.     Plaintiff San Francisco Employees' Retirement System ("SFERS" or "Plaintiff") is an agency of the City and County of San Francisco. SFERS is a defined benefit retirement plan. SFERS provides or will provide retirement benefits to over 50,000 active and retired employees of the City and County of San Francisco, the San Francisco Unified School District, and other local agencies. Including all purchases, sales and stock splits, on a net basis SFERS acquired 336,326 total shares of AIG common stock between October 1, 1999 and March 30, 2005. SFERS suffered losses on its investments in AIG common stock of over $4.2 million.

14.     Plaintiff and other Class members purchased AIG stock in the open market, unaware that defendants' statements and omissions regarding the stock and financial results were false and/or misleading and were causing AIG's stock price to be artificially inflated. Plaintiff and the Class relied upon defendants' statements and omissions in AIG's public reports, press releases, and SEC filings when they purchased AIG common stock and were thus injured by the defendants' actions. Plaintiff and the Class further relied on the integrity of the market for AIG securities and the fact that AIG common stock was fairly priced. Believing the defendants' statements to be true has resulted in injury to the plaintiff and each Class member.

4

**B.    Defendants**

15.    Defendant **American International Group Inc.** ("AIG") is a holding company

that, through its subsidiaries, is engaged in a range of insurance and insurance-related activities in

the United States and abroad. AIG operates in the United States. During the Class Period, AIG

had approximately 2.6 billion shares of common stock outstanding which was listed in the

United States on the New York Stock Exchange, as well as the stock exchanges in London, Paris,

Switzerland and Tokyo, and traded in an efficient market. In 2004, AIG became one of the 30

stocks in the Dow industrials.

16.    Defendant **C.V. Starr & Co., Inc.** ("Starr") is a private insurance brokerage

company and commercial casualty insurer, based in San Francisco, California. Starr develops

business and issues specialized policies for AIG and serves as a vehicle for AIG to award

deferred compensation source to its 80 partners, who are top executives of AIG. Starr is

privately owned and operated by AIG executives, many of whom perform functions virtually

identical to what they do at AIG. Greenberg is the CEO and Chairman of Starr, and owns about

17% of Starr's common stock. Starr is also a significant shareholder in AIG, controlling

approximately 2% of AIG shares, worth about $3 billion. Starr is also affiliated with the C.V.

Starr & Co., Inc. Trust ("Starr Trust"), which serves as a private holding entity for Starr

management, including Greenberg, who serves as a Trustee to the Starr Trust.

17.    Defendant **Starr International Inc.** ("SICO") is a private, offshore holding

company, operating out of Bermuda. SICO owns about 12% of AIG stock, making it AIG's

largest shareholder. SICO's main function is to provide deferred compensation to AIG

executives on top of their AIG pay, through SICO stock. Until recently, SICO maintained a joint

office with AIG in Bermuda. Greenberg and other AIG directors sat on the Board of SICO, have

5

large personal stakes in SICO, and decide who gets paid from the SICO assets. Greenberg controls 8.3% of the stock of SICO.

18.    Defendant **General Reinsurance Corporation** ("General Re") is a corporation providing reinsurance products and services. General Re is a wholly-owned subsidiary of Berkshire Hathaway.

19.    Defendant **Maurice Greenberg** ("Greenberg") is the former CEO and Chairman of the Board of AIG. Greenberg was forced to resign as CEO on March 14, 2005, following disclosures that he personally participated in the wrongful conduct alleged herein. Greenberg then resigned as Chairman of AIG on March 28, 2005, just days before his interview by government regulators at which he refused to testify and instead, invoked the 5th Amendment. During the Class Period, and up until the time he gifted 95% of his shares to his wife, Greenberg maintained significant control of AIG through his 1.7% personal shareholding and stakes in private entities that together owned another 15.7%. Greenberg controls 8.3% of the stock of SICO and is president and CEO of Starr, where he owns 17% of the common stock.

20.    Defendant **Howard Smith** ("Smith") is the former Chief Financial Officer and Vice Chairman of AIG. Smith prepared, signed and certified the false and misleading press releases and public SEC filings of AIG during the Class Period, including all Forms 10-Q and 10-K filed during the Class Period. Smith was fired in March 2005, after he refused to answer questions by government regulators.

21.    Defendant **Christian Milton** ("Milton") is the former Vice President of AIG, in charge of reinsurance. In that capacity, Milton worked with Greenberg to negotiate the General Re transaction described herein. Milton was fired in March 2005, after he refused to answer questions by government regulators.

6

22.    Defendant **L. Michael Murphy** ("Murphy") is a former senior executive at AIG, corporate secretary for SICO, and Greenberg's chosen person to help run the Bermuda-based unit of AIG and Bermuda-based affiliates. Murphy, a close confidante of Greenberg, was a reputed tax expert at AIG. Murphy was fired in March 2005, after he refused to answer questions by government regulators and instead.

23.    Defendants Greenberg, Smith, Milton and Murphy (the "Individual Defendants"), by reason of their stock ownership and positions with and relations to AIG, Starr and SICO, and other affiliated companies, were controlling persons of AIG, Starr and SICO. AIG, Starr and SICO in turn controlled the Individual Defendants. The Individual Defendants and AIG are liable under Section 20(a) of the 1934 Act.

24.    The Individual Defendants served as senior officers, directors and/or employees of AIG, Starr and/or SICO during the Class Period and, because of their positions, were able to control the contents of the representations made to stockholders and the public, had access to adverse undisclosed information regarding the company which contradicted the information disseminated to the public, and had the authority to prevent or correct the disseminations. Furthermore, the Individual Defendants each had an affirmative duty to promptly disseminate accurate and truthful information and/or correct any misleading and untrue information regarding AIG's financial condition, performance, growth, operations, financial statements, business, products, markets, management, earnings, and business prospects. Despite this affirmative duty, the Individual Defendants knowingly and intentionally made misleading statements and omissions in order to artificially inflate the price of AIG stock.

25.    Defendants are liable for the false statements pleaded herein. The statements are each "group-published" information for which they are responsible.

7

26.     Defendants are not protected by any statutory safe harbor for forward-looking statements because that protection does not extend to the allegedly false statements pleaded in this complaint. First, many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. Second, to the extent there were any forward-looking statements, defendants did not provide meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements pleaded herein. Defendants are liable for those false forward-looking statements because they knew, at the time each such statement was made, and/or authorized and/or approved by an executive officer and/or director of AIG, that those statements were false.

### 1.     Aiding and Abetting/Conspiracy

27.     Defendants, and each of them, are sued as participants and as aiders and abettors herein alleged. At all relevant times, each defendant was and is the agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each defendant ratified and/or authorized the wrongful acts of each of the defendants. There is a unity of interest and ownership between the defendants listed above, such that the acts of the one are for the benefit and can be imputed as the acts of the other.

### 2.     Unnamed Participants

28.     Numerous individuals and entities participated actively during the course of and in furtherance of the scheme described herein. The individuals and entities acted in concert by joint ventures and by acting as agents for principals, in order to advance the objectives of the scheme and to provide the scheme to benefit defendants and themselves through the purchase and sale of mutual funds to the detriment of plaintiffs and the Class.

8

## IV.   CLASS ALLEGATIONS

29.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal
Rules of Civil Procedure, on its own behalf and on behalf of the following class:

"All persons and entities who, during the Class Period from October 1, 1999
through March 30, 2005, purchased shares in AIG publicly traded securities."

The Class includes persons who were damaged by virtue of the misrepresentations, omissions
and schemes described herein, reflected in the loss of share value in response to news about
AIG's misstatements, between February 14, 2005, when AIG first disclosed that it had received
subpoenas from the SEC and NYAG, and April 1, 2005, after AIG admissions of financial
schemes and accounting errors.  Excluded from the Class are defendants herein, members of their
immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns
and any entity in which defendants have or had a controlling interest, officers and directors of
AIG and General Re and any entity in which they have or had a controlling interest including
SICO and Starr, and any other person who engaged in the improper conduct described herein (the
"Excluded Persons").  Also excluded are any officers, directors, or trustees of the Excluded
Persons.

30.    The members of the Class are so numerous and so widely dispersed throughout
the nation that joinder of all of them is impracticable.  While the exact number of Class members
is unknown to plaintiffs at the present time and can only be ascertained from books and records
maintained by defendants and/or their agents, plaintiff believes that the Class members number
in the hundreds of thousands.

31.    Plaintiff's claims are typical of those of other Class members.  Plaintiff purchased
AIG shares and sustained damages as a result of defendants' wrongful conduct complained of
herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the

Class.  Plaintiff has retained competent counsel experienced in class action securities litigation.

Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

33.     There are common questions of law and fact arising in this action with respect to

the Class, including, inter alia:

        a.      Whether defendants' acts alleged herein violated federal securities laws;

and

        b.      Whether plaintiff and members of the Class were damaged, and

the appropriate measure of damages.

34.     These questions of fact and law that are common to the Class predominate over

any questions solely affecting individual members.

35.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the

management of this action that would preclude its maintenance as a class action.

## V.      **FACTUAL ALLEGATIONS**

### A.      **The Corporate Culture At AIG**

36.     AIG traces its origins to China in the early 20th century.  In 1919, in Shanghai,

Cornelius Vander Starr founded American Asiatic Underwriters.  By 1939, Starr moved his

headquarters to New York, providing marine, fire and life insurance.

37.     Defendant Greenberg joined Starr's company in 1960 and, after Starr fell ill, took

over.  Greenberg applied an expansion strategy, acquiring multiple companies.  The parent

company became AIG.  Today, AIG is the world's largest insurance company, providing both

10

insurance and financial-services businesses. AIG reported revenue of $98.61 billion in 2004 and
does business in 130 countries.

38.     As the head of AIG for the past four decades, acting as its CEO and Chairman,
Greenberg has ruled AIG as a personal fiefdom and, at his direction, created a corporate culture
based on secrecy and loyalty and, in return, high financial rewards. In his executive suite filled
with Chinese artifacts, Greenberg reportedly had his own elevator guarded by is own security
detail, his own living room adjoining his office, and a private chandeliered dining room.
According to press reports citing former AIG executives, AIG management who traveled with
Greenberg on business were required to use the small pilot's bathroom in the front of the
corporate plane, while a large bathroom in the back of the plane was reserved for Greenberg, his
wife, and their Maltese dog, Snowball.

39.     AIG's high level management and its Board of Directors were both notoriously
close to Greenberg and hesitant to ask him questions because they didn't want to appear ignorant
or to challenge Greenberg's authority. At a board meeting, according to press reports, one
director asked Greenberg if the board shouldn't consider lessening the conflicting ties between
AIG and related entities essentially controlled by Greenberg, to which Greenberg replied, "That
would be stupid!" According to another report, responding to a director's inquiry during a board
meeting, Greenberg exclaimed, "That's a ridiculous question. You don't understand the
insurance business." Greenberg was also a contributor, through the Starr Foundation, a nonprofit
organization that he controlled, to institutions that some directors led or belonged to, including
over $44 million in contributions from 1998 to 2003.

11

**B.    AIG's Arrangements With Starr Entities**

40.    AIG's focus on growth reflects the personality of Greenberg. Managers under Greenberg were reportedly drilled on the importance of the "three 15s": 15% annual revenue growth, 15% annual profit growth, and 15% return on equity. Over the years, AIG created many rungs in the corporate ladder for its employees, including an invitation to play at MoreFar Golf Club in Brewster, New York, AIG's private course north of New York City.

41.    The preeminent incentive program, however, was the Starr program. During the Class Period, AIG maintained a highly unusual arrangement with two private, offshore entities – defendants SICO and Starr – used by Greenberg to assert and maintain firm control over his AIG managers through their compensation arrangements.

42.    SICO is a Bermuda holding company that owns about 12% of AIG stock, currently worth about $16 billion, making it AIG's largest shareholder. Until recently, SICO maintained a joint office with AIG in Bermuda, and Greenberg and other AIG directors sat on the Board of SICO with large personal stakes in SICO. SICO's main purpose is to provide additional compensation to AIG's employees, and has about 700 members. Under the SICO program, payouts can range from 10% to more than 1.5 times their base pay. In 2002, for example, SICO reportedly allotted Greenberg $11.1 million. In 2003, SICO paid AIG's employees $129.6 million in AIG common stock.

43.    The ultimate goal, however, is to become a "Starr partner." Starr is a insurance agency that operates both as a broker and underwriter, doing 47% of its business with AIG. It is privately owned and operated by a few current and former AIG executives, led by Greenberg, who owns 17%, and Martin Sullivan, who owns 4.6%. Many of the executives of Starr perform functions virtually identical to what they do do at AIG. Greenberg is the President and Chairman of

12

Starr. Sullivan, Greenberg's hand-picked successor as CEO of AIG, and a close confidante of Greenberg, also serves as a director in SICO and Starr. Starr is also a significant shareholder in AIG, controlling about 2% of AIG shares, worth about $2.5 billion.

44.     Like SICO, Starr was used as a compensation source to supplement AIG employee's paychecks. However, unlike SICO, Starr comprises only about 80 partners, including the highest ranking executives of AIG. When members are invited to join, they reportedly are allotted a 0.5% nonvoting stake costing them about $300 per share, often funded with loans from the company. Every year, if they produce, their stakes and power increase. One percent, for example, brings voting rights.

45.     According to press reports, the Starr partners meet each year at AIG's headquarters and gather in the giant conference boardroom, where they receive an envelope with their name on the front and a single sheet of paper inside. The paper has two lines, listing how many preferred shares the recipient received that year in the Starr partnership and how much their prior stake's value climbed in the year. Greenberg, Starr's Chairman, usually gives a quick update of the business, few questions are asked, and the meeting ends with attendees breaking for dinner. The Wall Street Journal recently quoted Greenberg to state, "It is the ultimate accolade," and membership "makes people feel that they are part of a club."

46.     The Starr and SICO entities amount to a massive conflict of interest and anomaly in American business – large shareholders intimately involved in the executive compensation and operations of a public company, operating entirely outside its corporate structure. Indeed, by virtue of this arrangement, Greenberg and SICO are able to hide executive pay amounts from public scrutiny and take away powers that ordinarily and properly lie with personnel departments and reviewed by the compensation committee of a Board. Greenberg could and did dole out

13

perks at his own discretion, determining which AIG employees were going to retire millionaires or even billionaires.

47.     The Starr and SICO entities provided an effective and private instrument for Greenberg to wield power and maintain control of AIG. Because of the Starr and SICO structure, management had personal financial reasons not to speak up and incur Greenberg's wrath or risk exclusion from the lucrative benefits. Moreover, anyone who left AIG, or was fired, prior to retirement typically forfeited their lucrative payments. The message was well known at AIG: if you toed the line drawn by Greenberg, you could be set for life.

48.     Finally, because the Starr and SICO entities did business with AIG, they were steeped in conflicts of interest. The Starr and SICO entities provided defendants, including Greenberg, with a mechanism to massage financial results through complex reinsurance transactions, using companies owned, operated or controlled by Starr and/or SICO.

49.     One such company was Astral Reinsurance Co, a reinsurance company based in Bermuda and managed by AIG executives, including Murphy. Astral was at least partly owned by SICO, and run by Murphy and Joseph Johnson, Astral's President and at the same time, an employee of AIG. Johnson is currently the chairman of AIG's Bermuda operations. Murphy, Johnson and Stuart Osborne, another AIG executive in Bermuda, served as Astral's directors. Osborne, an accountant, resigned from AIG in April 2005 without stating a reason. Until it was liquidated in 2002, Astral shared an address with SICO and AIG in Bermuda, and held more than 1% of AIG's stock. According to reports, securities regulators are investigating whether AIG used Astral to hide liabilities or boost income through the use of reinsurance transactions. Murphy and Johnson ran at least two other small insurance firms in Bermuda, Civic Insurance Co. and Omnivintage Insurance, which was set up to reinsure AIG business.

14

## C.    The Pervasive Accounting Improprieties

50.     During the Class Period, defendants were focused on public reaction to its key financial metrics, including reserves, premium income, and earnings, in order to boost the AIG stock price. AIG promoted itself as being a model of earnings consistency against competitors in a notoriously volatile industry, and went to extreme lengths to maintain this perception, even if artificial, including taking full advantage of AIG's affiliate companies set-up and run by Greenberg himself.

### 1.    Use Of Offshore, AIG Affiliates To Manipulate Financial Statements

51.     AIG set up a complex web of subsidiaries and affiliate companies worldwide for a variety of reasons, including to shield its tax liabilities and improperly burnish its financial results.

52.     Several of these affiliate companies were engaged in the business of reinsurance. Reinsurance is insurance that insurers buy to spread losses from policies they sell to individuals and companies. AIG's general insurance company subsidiaries operate worldwide, primarily by underwriting and accepting risks for their direct account and securing reinsurance on that portion of the risk in excess of the limit which they wish to retain.

53.     AIG subsidiaries also ceded business to each other. For example, during the Class Period, Union Excess Reinsurance Company, Ltd. ("Union Excess") a Barbados-based company *affiliated with AIG*, reinsured risks emanating primarily or solely from AIG subsidiaries, both directly and indirectly. At the time of this business, a significant portion of the ownership interests of Union Excess shareholders were protected under financial arrangements with SICO, the private holding company controlled by Greenberg and AIG's largest shareholder.

15

54.    During the Class Period, the transactions with Union Excess permitted AIG to reflect income arising from the discounting of reserves permitted under Barbados law. However, since Union Excess was an affiliate, AIG should have treated Union Excess as an consolidated entity in its financial reporting. Despite defendants' knowledge of and consent to this relationship, it did not. Properly incorporating these transactions into AIG's books will now result in a reduction of approximately *$1.1 billion* in AIG's consolidated shareholders' equity as of December 31, 2004, reflecting the after-tax cumulative effect of the transactions with Union Excess over a 14 year period from 1991 to 2004.

55.    AIG subsidiaries also ceded reinsurance to subsidiaries of Richmond Insurance Company, Ltd. ("Richmond"), a Bermuda-based reinsurance holding company that AIG controls and holds a 19.9% ownership interest in. Again, based on such control, defendants knew that Richmond should have been treated as a affiliate and consolidated entity in AIG's financial statements. It was not. Consolidation of Richmond will result in an increase in consolidated liabilities and a decrease in AIG's consolidated shareholders' equity as of December 31, 2004.

56.    AIG also entered into improper transactions with Capco Reinsurance Company, Ltd. ("Capco"), a Barbados-based reinsurer, again with defendants' knowledge and consent. The transactions involved a self-described "improper structure" created by AIG to recharacterize underwriting losses as capital losses, since underwriting losses hit operating profits, a key earnings metric in the insurance industry. The structure, which consisted primarily of arrangements between subsidiaries of AIG and Capco, required that Capco be treated as a consolidated entity in AIG's financial statements. It was not. As a result, AIG must now restate $200 million capital losses as an equal amount of underwriting losses relating to auto warranty business from 2000 through 2003.

16

### 2.   AIG's Sham Reinsurance Deal With General Re

57.     In 2000, the property and casualty insurance market was suffering from an extended downturn, and questions were being raised about whether AIG had sufficient reserves, the money set aside to pay future claims. The day AIG posted its third-quarter earnings results with reduced claims reserves, AIG's shares fell 6%. Reserves are a critical gauge of an insurance company's solvency and financial strength. Usually, reserves are bolstered by taking money out of earnings. Greenberg had different plans, wanting to increase premiums risk free.

58.     In October 2000, Greenberg contacted Ronald Ferguson, then chief of General Re. Greenberg told Ferguson that he wanted to do a deal with General Re to boost AIG's reserves for the coming quarter. Greenberg proposed that General Re transfer a block of business to AIG, including both premiums and the responsibility for paying some claims and, in return, promised General Re a fee.

59.     Defendants structured the deal in a convoluted manner to avoid scrutiny, utilizing AIG and General Re offshore subsidiaries. At Greenberg's direction, defendant Milton negotiated with Ferguson and John Houldsworth, the chief underwriter for General Re's finite insurance products in Dublin, and structured the deal so that AIG's Bermuda unit, National Union, purchased a portfolio of claims and premiums worth $500 million from General Re's Cologne Re unit in Dublin. The deal included two tranches of $250 million each which took place in December 2000 and March 2001. In connection with each tranche, National Union booked the premiums as revenue and added $250 million to its reserves for potential losses in each of the fourth quarter of 2000 and the first quarter of 2001, ultimately boosting AIG's reserves by $500 million.

17

60.     As now admitted by AIG, the Gen Re transaction was a sham and the
documentation for the deal improper. Since AIG faced little or no risk on the deal, it was not
insuring anything, and should not either have treated the $500 million as premium revenue or
have increased its reserves. The transactions should not have been recorded or accounted for as
insurance on AIG's books, and should have been characterized as a loan, given there was no
legitimate risk transfer.

61.     Defendants, including Greenberg and Milton who negotiated the deal, knew that
the deal was reached for the sole purpose of inflating reserves, yet intentionally concealed this
information from the public. For example, Milton and an AIG finance executive participated in a
November 2000 conference call with two General Re executives, Rick Napier and Elizabeth
Monrad, before the deal was executed, and Milton was reportedly told that the deal wouldn't
transfer enough risk to qualify for the favorable accounting treatment that AIG subsequently
used. Napier and Monrad reportedly asked Milton if that was still acceptable to AIG and were
told that the lack of risk transfer didn't cause them problems.

62.     Securities regulators have reportedly assembled documents and emails from AIG
and General Re detailing the transaction – code named "Project Alpha" – and discussing
Greenberg's personal directions on how to structure the deal to make it risk free. In a recorded
phone conversation, a General Re employee reportedly remarked that the deal with AIG would
allow the insurer "to cook its books." Another email from a General Re executive reportedly
refers to a "discussion" between Greenberg (identified by his initials "MRG") and Ferguson
involving several aspects of the deal, including the comment, "We need to work out a
mechanism" for AIG to pay General Re for the deal. Investigators also reportedly discovered that

18

AIG didn't even set up an underwriting file – essentially a risk analysis – on the deal, a typical step in insurance transactions that involve real risk.

63.     Greenberg and Milton even structured the bonus payment to General Re – $5 million – in a convoluted manner to avoid scrutiny. According to press reports, General Re first paid AIG $10 million in fees. AIG then returned that sum to General Re along with the $5 million in fees, routing the money through an AIG-affiliated insurer. General Re split the net $5 million with Cologne Re.

64.     In January 2005, General Re attorneys reportedly discovered an email from a General Re employee to an employee of its Cologne Re unit urging that a file relating to the transaction be kept "locked in a drawer." Instead, the documents were provided to the SEC and NYAG on or about February 8, 2005. The next day, with evidence that Greenberg and Milton put together a phony insurance deal whose main purpose was merely to boost AIG's reserves, AIG's records were subpoenaed.

65.     AIG has now commuted the first $250 million tranche of the transaction with General Re, which reduced premiums and reserves for losses and loss expenses by approximately $250 million in the fourth quarter 2004 previously reported unaudited financial information. The second tranche remains on AIG's books as previously recorded but will also have to be corrected. AIG's financial statements will have to be adjusted to recharacterize such transactions as deposits rather than as consolidated net premiums, reducing the reserve for losses and loss expenses by $250 million and increasing other liabilities by $245 million.

### 3.     Covered Calls On Bonds

66.     From 2001 to 2003, AIG entered into a series of transactions with third parties whereby AIG subsidiaries agreed to sell in-the-money call options on bonds in their portfolios

19

that had unrealized appreciation associated with them. Through a series of forward transactions and swaps that allowed AIG to retain the bonds, AIG recognized net investment income in the amount of the unrealized gains. Thus, AIG kept the bonds and their capital gains. The result was that $300 million in net investment income was booked early.

### 4.    Misstated Accounting Items

67.    During the Class Period, AIG misstated its ability to recover certain balances, consisting mainly of receivables in the domestic general insurance operations. According to its recent admissions, AIG currently believes that the after-tax impact of these charges could be up to $300 million.

68.    During the Class Period, AIG misstated its deferred acquisition costs and certain other accruals and allowances with respect to AIG's general insurance and financial services subsidiaries. According to AIG's recent admissions, the revisions will result in an aggregate after tax charge of approximately $370 million.

69.    During the Class Period, AIG failed to properly identify and report its net investment income. As a result of the "misclassifications" that AIG has recently admitted to, the reported net investment income over the period from 2000 through 2004 was overstated by approximately four percent. In a March 31, 2005 article, the New York Times said that a report from Dowling & Partners Securities, an insurance research firm in Farmington, Connecticut, concluded that the amount of investment income that was overstated totaled $800 milion over the first three quarters of 2004 alone.

70.    During the Class Period, AIG failed to properly account for the deferred compensation granted to certain AIG employees by SICO, its affiliate. Under the accounting rules for stock compensation, if a principal stockholder of a company establishes a stock plan to

20

pay that company's employees, the company must account for the payments as an expense on its

own income statement. The payments from SICO were not included as expenses in the

calculation of AIG's consolidated net income. AIG has now acknowledged that it will have to

record the payments as expenses, which will be a charge to reported earnings.

**D.      Defendants Conceal Accounting Improprieties And Misstate AIG's Financial**

**Condition In Public Reports, Filings And Statements**

71.      During the Class Period, in each and every Form 10-Q and Form 10-K filed with

the SEC, and in each and every press release announcing AIG's financial results which

accompanied the SEC filings as described in more detail below, defendants concealed the

deceptive and improper accounting practices described above, and later revealed in AIG's March

30, 2005 press release, and instead, repeatedly overstated the Company's financial condition

because of such omissions.

72.      AIG issued a press release on October 28, 1999, announcing that its Third Quarter

Income rose 17.8% to $1.27 billion. The release, in pertinent part, stated:

> American International Group, Inc. (AIG) today reported that its income for the
> third quarter of 1999 increased 17.8 percent to $1.27 billion, compared to $1.08
> billion in the third quarter of 1998. For the first nine months of 1999, net income
> totaled $3.74 billion, an increase of 18.4 percent, compared to $3.16 billion in the
> same period of 1998.

73.      AIG issued a press release on February 10, 2000, announcing its Fourth Quarter

and Year End 1999 financial results. The release, in pertinent part, stated:

> American International Group, Inc. (AIG) today reported that its net income for
> 1999 increased 18.1 percent to $5.06 billion from $4.28 billion in 1998. For the
> fourth quarter of 1999, net income totaled $1.31 billion, an increase of 17.2
> percent, compared to $1.12 billion in the same period of 1998.

74.      AIG issued a press release on April 27, 2000, announcing that its First Quarter

Income rose 15.5% to $1.36 billion. The release, in pertinent part, stated:

21

American International Group, Inc. (AIG) today reported that its net income for the first quarter of 2000 increased 12.3 percent to $1.35 billion, compared to $1.20 billion in the first quarter of 1999. Excluding net realized capital gains (losses), income increased 15.5 percent to $1.36 billion, compared to $1.18 billion in the first quarter of 1999.
Income before income taxes, minority interest and realized capital gains (losses) for the first quarter of 2000 increased 14.9 percent to $2.01 billion from $1.75 billion reported in 1999.

Revenues in the first quarter of 2000 rose 10.8 percent to $10.89 billion from $9.82 billion in the year-earlier quarter. AIG's shareholders' equity rose over $500 million to approximately $33.8 billion at March 31, 2000, after open market purchases during the quarter of 10.4 million shares of AIG common stock. At that date, AIG's consolidated assets approximated $278 billion.

AIG Chairman Mr. Greenberg commenting on the results said, "Overall, it was a good quarter for AIG. Each of our principal business groups produced solid results."

"Worldwide general insurance net premiums written rose 4.3 percent in the quarter, and we achieved an adjusted underwriting profit of $211.5 million. Our combined ratio was 95.78, compared to 95.28 in last year's first quarter. Excluding catastrophe losses of $25 million in the quarter versus zero in last year"s first quarter, the combined ratio for first quarter 2000 was 95.17. We added $22 million to AIG's net loss and loss adjustment reserves in the quarter, bringing the total of such reserves to$24.6 billion at March 31. This reserve increase was reduced by $75 million of catastrophe losses paid in the first quarter from pre-2000 incurred losses."

75.    AIG issued a press release on July 27, 2000, announcing that its Second Quarter

2000 Income rose 13.1% to $1.43 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 13.1 percent to $1.43 billion in the second quarter and 14.2 percent to $2.79 billion for the first six months of 2000. Net income for the second quarter of 2000 increased 10.2 percent to $.1.41 billion, compared to $1.28 billion in the second quarter of 1999. For the first six months of 2000, net income totaled $2.75 billion, an increase of 11.2 percent compared to $2.48 billion in the same period of 1999.

Income before income taxes, minority interest and realized capital gains (losses) for the second quarter of 2000 amounted to $2.13 billion, and increase of 12.8 percent over the $1.89 billion reported in 1999.

For the first six months of 2000, income before income taxes, minority interest and realized capital gains (losses) increased 13.8 percent to $4.14 billion from $3.64 billion reported last year.

Revenues in the second quarter of 2000 rose 12.1 percent to $11.43 billion from $10.20 billion in the year-earlier quarter. For the first six months, revenues totaled $22.32 billion, an increase of 11.5 percent over $20.02 billion in 1999.

AIG Chairman Mr. Greenberg commenting on the results said, "It was a good quarter for AIG overall, with strong results from most of our major businesses and continued progress in terms of firming pricing in the U.S. property-casualty market.

"Worldwide general insurance net premiums written rose 7.5 percent in the quarter, and we achieved an adjusted underwriting profit of $227.9 million. The combined ratio was 95.92, compared to 94.60 for the second quarter of 1999. During the quarter, we continued to pay claims, amounting to $57 million, related to last year's catastrophes, and also incurred new net catastrophe losses of $19 million."

76.    AIG issued a press release on October 26, 2000, announcing that its Third Quarter

Income rose 14.6% to $1.41 Billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 14.6 percent to $1.41 billion in the third quarter and 14.4 percent to $4.21 billion for the first nine months of 2000.

Net income for the third quarter of 2000, including net realized capital gains (losses),increased 9.3 percent to $1.39 billion, compared to $1.27 billion in the third quarter of 1999. For the first nine months of 2000, net income totaled $4.14 billion, an increase of 10.6 percent, compared to $3.74 billion in the same period of 1999.

Income before income taxes, minority interest and realized capital gains (losses) for the third quarter of 2000 amounted to $2.10 billion, an increase of 15.8 percent over the $1.81 billion reported in 1999. For the first nine months of 2000, income before income taxes, minority interest and realized capital gains (losses) increased 14.5 percent to $6.24 billion from $5.45 billion reported last year.

Revenues in the third quarter of 2000 rose 15.6 percent to $11.14 billion from $9.64 billion in the year-earlier quarter. For the first nine months, revenues totaled $33.46 billion, an increase of 12.8 percent over $29.66 billion in 1999.

23

AIG Chairman M.r. Greenberg commenting on the results said, "AIG had a very good quarter, with increased momentum on the domestic commercial insurance pricing front, strong results from our overseas general insurance business, an excellent quarter for life insurance, and outstanding results in our financial services and asset management businesses."

"Worldwide general insurance net premiums written increased 8.1 percent to $.29 billion, our largest percentage increase of the year, and we achieved an adjusted underwriting profit of $192.7 million. The combined ratio was 96.25, compared to 96.56 in last year's third. General insurance operating income for th quarter posted a 14.0 percent increase over last year. Overall, our general insurance business is in very strong shape around the world and our underwriting results continue to be satisfactory."

77.     AIG issued a press release on February 8, 2001, announcing that its 2000 Net

Income rose 14.8% to a record $5.74 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 14.8 percent to $5.74 billion for the year 2000 and 15.9 percent to $1.53 billion in the fourth quarter of 2000.

Revenues for the year 2000 rose 13.1 percent to $ 45.97 billion from $40.66 billion in 1999. Fourth quarter revenues totaled $12.15 billion, an increase of 13.8 percent over $11.00 billion in the year earlier quarter.

Income before taxes, minority interest and realized capital gains (losses) for the year 2000 increased 14.8 percent to $8.49 billion frm $7.39 billion reported last year. For, the fourth quarter of 2000, income before income taxes, minority interest and realized capital losses amounted to $2.24 billion, an increase of 15.9 percent over the $1.94 billion reported in 1999.

AIG Chairman M.R. Greenberg commenting on the results said, "AIG had a very good quarter and year. Our worldwide business reported strong results and met their goals for the year. Net income for the year 2000 before realized capital gains and losses rose 14.8 percent to a record $5.74 billion, or $2.45 per share. AIG is well positioned in 2001 in our principal markets. The strengthening rate environment across the board, both in the U.S. property-casualty market and in key overseas markets, is a major positive event for our industry and most particularity for AIG."

"We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, and together with the acquisition of HSB Group. Inc., increased the total of those reserves to $25.0 billion at year-end 2000."

24

78.     AIG issued a press release on April 26, 2001, announcing that its First Quarter

2001 Income rose 15.2% to $1.57 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its income
excluding the cumulative effect of an accounting change and net realized capital
gains (losses) for the first quarter of 2001 increased 15.2 percent to $1.57 billion,
compared to $1.36 billion in the first quarter of 2000. Net income increased 13.8
percent to $1.53 billion, compared to $1.35 billion in the first quarter of 2000.

Revenues in the first quarter of 2001 rose 11.6 percent to $12.15 billion from
$10.89 billion in the year-earlier quarter. At March 31, 2001, AIG's consolidated
assets and shareholders' equity approximated $315 billion and $41.7 billion,
respectively.

AIG Chairman M.r. Greenberg commenting on the results said, "AIG had a solid first
quarter, benefitting from a continuing strengthening of pricing in the commercial
property-casualty market, as well as strong performance by our overseas life insurance
business and financial services businesses. Excluding the cumulative effect of an
accounting change and realized capital gains and losses, AIG's net income rose 15.2
percent in the quarter to $1.57 billion, or $0.67 per share."

"We added $63 million to AIG's general insurance net loss and loss adjustment reserves
for the quarter, bringing the total of those reserves to $25.0 billion at March 31, 2001.

79.     AIG issued a press release on July 26, 2001, announcing that its Second Quarter

2001 Income rose 14.1% to $1.66 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its income
excluding net realized capital gains (losses) increased 15.8 percent to $1.66 billion
in the second quarter and, also excluding the first quarter cumulative effect of a
FASB mandated accounting change, 15.5 percent to $3.23 billion for the first six
months of 2001.

Revenues in the second quarter of 2001 rose 10.1 percent to $12.58 billion from $11.43
billion in the year-earlier quarter. For the first six months, revenues totaled $24.73
billion, ans increase of 10.8 percent over at $22.32 billion in 2000.

80.     AIG issued a press release on October 25, 2001, announcing that its Third Quarter

2001 Income rose 14.1% to $1.92 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its core income increased
14.1 percent to $1.92 billion in the third quarter and 13.9 percent to $5.69 billion for the

25

first nine months of 2001. These results are in line with guidance furnished during AIG's October 9, investor conference call.

Revenues in the third quarter of 2001 increased 12.9 percent to $15.73 billion form $13.93 in the year-earlier quarter. For the first nine months, revenues totaled $46.0 billion, an increase of 10.2 percent over $41.74 billion in 2000.

81.    AIG issued a press release on February 7, 2002, announcing that its 2001 Net

Income was $1.87 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its fourth quarter 2001 net income was $1.87 billion, compared to $1.80 billion in the fourth quarter of 2000.

Core income increased 10.3 percent to $1.98 billion or $0.75 per share, compared to $1.79 billion or $0.68 per share in the fourth quarter of 2000. These 2001 results include $0.03 per share to Enron surety losses and a provision for Northridge earthquake claims.

Revenues for the year 2001 rose 10.2 percent to $63.24 billion from $57.37 billion in 2000. Fourth quarter revenues totaled $16.69 billion, an increase of 8.3 percent over $15.41 billion in the year earlier quarter.

82.    AIG issued a press release on April 25, 2002, announcing that its First Quarter

2002 Income increased 11.1% to $2.13 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its first quarter 2002 adjusted income, excluding net realized capital gains (losses) and the cumulative effect of an accounting change in 2001, increased 11.1 percent to $2.13 billion, compare to $1.92 billion in the first quarter of 2001.

AIG Chairman Mr. Greenberg commenting on the results said, "AIG is off t o a very good start in 2002. Excluding realized capital gains and losses, AIG's first quarter net income rose 11.1 percent to a record $2.13 billion. On a per share basis, income as adjusted rose 12.5 percent in the first quarter. Once again, the strength and diversity of AIG's worldwide portfolio of businesses stood out. . . ."

83.    AIG issued a press release on July 25, 2002, announcing that its Second Quarter

2002 Net Income rose 37% to $1.8 billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2002 increased 37.0 percent to $1.80 billion, compared to $1.31 billion in the second quarter of 2001.

26

For the first six months of 2002, net income totaled $3.78 billion, an increase of
19.3 percent compared to $3.17 billion in the same period of 2001.

In the quarter and six months respectively, $378 million and $505 million were added to
AIG's General Insurance net loss and loss adjustment reserves, bringing the total of those
reserves to$26.4 billion at June 30, 2002.  Reserves for the September 11 terrorist attacks
continue to be adequate.

Second quarter 2002 adjusted income, excluding net realized capital gains (losses)
and the cumulative effect of accounting changes and acquisition, restructuring and
related charges in 2001, increased 9.8 percent to $2.21 billion, and 10.4 percent to
$4.34 billion for the first six months of 2002.

84.     AIG issues a press release on October 24, 2002, announcing its Third Quarter

2002 Net Income of $1.84 billion as compared to $326.8 million in 2001.  The release, in

pertinent part, stated:

American International Group, Inc. (AIG) today reported that its net income for
the third quarter of 2002 was $1.84 billion, compared to $326.8 million in the
third quarter of 2001.  For the first nine months of 2002, net income totaled $5.62
billion, an increase of 60.8 percent compared to $3.50 billion in the same period
of 2001.

Income as adjusted-excluding net realized capital gains (losses) in both years and
in 2001 the cumulative effect of accounting changes and acquisition.,
restructuring and related charges-increased 54.6 percent to $2.23 billion in the
third quarter and 22.3 percent to $6.58 billion for the first nine months of 2002.

85.     AIG issues a press release on February 13, 2003, announcing its 2002 Net Income

of $5.52 billion as compared to $5.36 billion in 2001.  The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its net income for the full
year 2002 was $5.52 billion, compared to $5.36 billion in 2001.  The fourth quarter of
2002 resulted in a net loss of $103.8 million, compared to net income of $1.87 billion in
the same period of 2001.

On February 3, AIG announced that it would incur a net, after tax charge of $1.8 billion
in the fourth quarter of 2002 related to an increase of general insurance net loss and loss
adjustment reserves, following the completion of AIG's annual year-end loss reserve
study. Fourth quarter 2002 income as adjusted, excluding the reserve charge and realized
gains and losses, increased 13.9 percent to $2.33 billion.  For the full year 2002, income
adjusted was $8.91 billion, and increase of 11.9 percent over the full year 2001, which

27

was also adjusted for th cumulative effect of accounting changes, acquisition, restructuring and related charges and World Trade Center and related losses.

AIG Chairman Mr. Greenberg commenting on the results said: "In 2002 AIG earned $7.12 billion before realized capital losses, even after taking an after-tax charge of $1.8 billion to increase general insurance reserves. AIG in 2002 had record revenues of $67.5 billion, record general insurance cash flow of $6.92 billion and record shareholders' equity of $59 billion at year end."

86.    AIG issues a press release on April 24, 2003, announcing its First Quarter 2003

Net Income of $1.95 billion as compared to $1.98 billion in the first quarter of 2002. The

release, in pertinent part, stated:

American International Group, Inc., (AIG) today reported that its first quarter 2003 net income was $1.95 billion or $0.74 per share, compared to $1.98 billion or $0.75 per share in the first quarter of 2002. First quarter 2003 income as adjusted to exclude net realized capital gains (losses), increased 11.1 percent to $2.37 billion compared to $2.13 billion in the first quarter of 2002. Per share income, as adjusted was $0.90, an increase of 11.1 percent over $0.81 in first quarter 2002.

AIG Chairman Mr. Greenberg commenting on the results said, "AIG had a good first quarter. General Insurance, Life Insurance and Financial Services all had double digit growth in operating income, excluding realized capital losses. Retirement Savings continue to be impacted by a weak global market."

"Shareholders' equity at March 31, 2003, was a record $62 billion. Assets were a record high of $590 billion and the annualized return on equity for the quarter was a strong 16.9 percent."

87.    AIG issued a press release on  July 24, 2003, announcing that its Second Quarter

2003 Net Income rose 26.4% to $2.28 Billion. AIG also announced an additional 25% increase

in its Quarterly Common Stock Dividend. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its net income for the second quarter of 2003 increased 26.4 percent to $2.28 billion, compared to $1.80 billion in the second quarter of 2002. For the first six months of 2003, net income totaled $4.23 billion, an increase of 11.9 percent compared to $3.78 billion in the same period of 2002.

AIG Chairman Mr. Greenberg commenting on the results said, "AIG had a very good quarter. General Insurance, Life Insurance, and Financial Services all had record results.

28

Retirement Savings & Asset Management had improved performance as equity markets made gains."

"Over the second quarter, assets and shareholders' equity both rose to record levels. At June 30, 2003, assets approximated $620 billion and shareholders' equity exceeded $68 billion."

88.   AIG issued a press release on October 23, 2003, announcing that its Third Quarter

2003 Net Income rose 26.9% to $2.34 Billion. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2003 increased 26.9 percent to $2.34 billion, compared to $1.84 billion in the third quarter of 2002. For the first nine months of 2003, net income totaled $6.57 billion, an increase of 16.8 percent compared to $5.62 billion in the same period of 2002. Net income excluding realized capital losses increased 15.4 percent to $2.58 billion in the third quarter of 2003, and 13.5 percent to $7.46 billion for the first nine months of 2003.

89.   AIG issued a press release on February 11, 2004, announcing that its 2003 Net

Income was $9.27 Billion, an increase of 68% over 2002. The release, in pertinent part, stated:

American International Group, Inc. (AIG) today reported that its net income for the full year 2003 increased 68.0 percent to a record $9.27 billion, compared to $5.52 billion in 2002. Net income excluding realized capital gains (losses) and cumulative effect of an accounting change increased 43.6 percent to a record $10.22 billion in the full year 2003.

Net income in the fourth quarter of 2003 totaled a record $2.71 billion compared to a loss of $103.8 million in the same period of 2002. Fourth quarter 2003 net income excluding realized capital gains (losses) and cumulative effect of an accounting change was a record $2.75 billion compared to $537.5 million in the same period of 2002. Results for fourth quarter and full year. 2002 include the $1.8 billion net, after tax general insurance reserve charge.

Income before income taxes, minority interest, cumulative effect of an accounting change and pretax realized capital gains (losses) for the twelve months of 2003 increased 45.0 percent to $15.34 billion. Income before income taxes, minority interest, cumulative effect of an accounting change and pretax realized capital gains (losses) for the fourth quarter of 2003 was $4.14 billion, compared to $671.6 million in the fourth quarter of 2002.

90.    AIG issued a press release on April 22, 2004, announcing its First Quarter 2004

Net Income of $2.66 billion, or $1.01 per share, an increase of 35.9% over 2003. The release, in

pertinent part, stated:

> American International Group, Inc. (AIG) today reported that its first quarter 2004
> net income rose 35.9 percent to $2.66 billion or $1.01 per share, compared to
> $1.95 billion or $0.74 per share in the first quarter of 2003. First quarter 2004 net
> income excluding realized capital gains (losses) and the cumulative effect of an
> accounting change, increased 19.9 percent to a record $2.84 billion or $1.08 per
> share, compared to $2.37 billion or $0.90 per share in the first quarter of 2003.
>
> Income before income taxes, minority interest and the cumulative effect of an
> accounting change for the first quarter of 2004 was a record $4.29 billion, a 46.8
> percent increase over $2.92 billion in the first quarter of 2003. These results
> include realized capital gains of $4.9 million in the first quarter of 2004,
> compared to realized capital losses of $631.5 million in the same period last year.

91.    AIG issued a press release on July 22, 2004, announcing its Second Quarter 2004

Net Income of $2.86 billion, or $1.09 per share, an increase of 25.7% over 2003. The release, in

pertinent part, stated:

> American International Group, Inc. (AIG) today reported that its second quarter
> 2004 net income rose 25.7 percent to a record $2.86 billion or $1.09 per share,
> compared to $2.28 billion or $0.87 per share in the second quarter of 2003.
> Second quarter 2004 net income excluding realized capital gains (losses),
> increased 19.2 percent to a record $3.00 billion or $1.14 per share, compared to
> $2.52 billion or $0.96 per share in the same period of 2003.
>
> Net income for the first six months of 2004 rose 30.4 percent to $5.52 billion or
> $2.10 per share, compared to $4.23 billion or $1.61 per share in the first six
> months of 2003. For the first six months of 2004 net income excluding realized
> capital gains (losses) and the cumulative effect of an accounting change, increased
> 19.5 percent to $5.84 billion or $2.22 per share, compared to $4.89 billion or
> $1.86 per share in the same period of 2003.
>
> Income before income taxes and minority interest for the second quarter of 2004
> was a record $4.39 billion, a 27.9 percent increase over $3.43 billion in the second
> quarter of 2003. Income before income taxes, minority interest and the
> cumulative effect of an accounting change for the first six months of 2004 was
> $8.68 billion, a 36.6 percent increase over $6.35 billion in the same period of
> 2003. These results include realized capital losses of $209.0 million and $204.1
> million in the second quarter and six months of 2004, respectively, compared to

realized capital losses of $356.9 million and $988.4 million in the second quarter
and six months of 2003, respectively.

92.    AIG issued a press release on October 21, 2004, announcing its Third Quarter

2004 Net Income of $2.51 billion and net income excluding realized capital gains and losses of

$2.54 billion. The release, in pertinent part, stated:

> American International Group, Inc., (AIG) today reported third quarter 2004 net income
> of $2.51 billion or $0.95 per share, compared to $2.34 billion or $0.89 per share in the
> third quarter of 2003.  Third quarter 2004 net income excluding realized capital gains
> (losses), was $2.54 billion or $0.97 per share, compared to $2.58 billion or $0.98 per
> share in the same period of 2003.  Third quarter 2004 after tax net catastrophe losses from
> hurricanes and typhoons were $512.2 million or $0.19 per share, compared to after tax
> new catastrophe losses of $46.2 million or $0.02 per share in the third quarter of 2003.
> Third quarter 2004 net income excluding realized capital gains (losses) and catastrophe
> losses increased 16.5 percent to $3.06 billion or $1.16 per share, compared to $2.62
> billion or $1.00 per share in the same period fo 2003.

> AIG Chairman Mr. Greenberg commenting on the results said, "AIG had third quarter net
> income of $2.51 billion, up 7.5 percent, even after accounting for the unprecedented
> succession of storms, which included four hurricanes and three typhoons.  Excluding
> realized capital gains (losses) and catastrophe losses, net income in the third quarter of
> 2004 increased 16.5 percent over a year ago.  For the first nine months of 2004, net
> income was a record $8.03 billion, up 22.3 percent.  Excluding realized capital gains
> (losses), cumulative effect of an accounting change and catastrophe losses, net income for
> the first nine months increased 18.5 percent."

93.    AIG issued a press release on February 9, 2005, announcing its 2004 Net Income

of $11.05 billion, an increase of 19.1% over 2003.  The release, in pertinent part, stated:

> American International Group, Inc., (AIG) today reported that its net income for the full
> year 2004 increased 19.1 percent to a record $11.05 billion or $4.19 per share, compared
> to $9.27 billion or $3.52 per share in 2003.  Net income exceeding realized capital gains
> (losses) and cumulative effect of accounting changes was $11.46 billion or $4.35 per
> share, compared to $10.22 billion or $3.88 per share in 2003.

> Net income for the fourth quarter of 2004 rose 11.5 percent to $3.02 billion or $1.1 per
> share, compared to $2.71 billion or $1.03 per share in the fourth quarter of 2003.  For the
> fourth quarter of 2004, net income excluding realized capital gains (losses) and the
> cumulative effect of an accounting change increased 11.6 percent to $3.07 billion or
> $1.17 per share, compared to $2.75 billion or $1.05 per share in the same period of 2003.

31

##### E.   Securities Regulators Subpoena AIG's Records

94.     On February 9, 2005 – the same day of AIG's press release and conference call

announcing its year end 2004 and fourth quarter 2004 financial results – the NYAG and SEC

issued subpoenas to AIG. On Friday 14, 2005, AIG issued a press release announcing that it had

received subpoenas from the NYAG and SEC following its earnings conference call. According

to AIG, the subpoenas related "to investigations of non-traditional insurance products and certain

assumed reinsurance transactions and AIG's accounting for such transactions. AIG will

cooperate in responding to the subpoenas." No further detail was provided.

95.     On Sunday, March 13, 2005, according to press reports, the outside directors

convened at their lawyer's offices to discuss the probe and what they should do with Greenberg.

As directors began the discussion, Greenberg called in from his boat in Florida and reportedly

told the group, "You couldn't even spell the word insurance." Later, he called again from the

corporate jet, and criticized AIG's lead director Frank Zarb, a longtime friend, and the former

chairman of the National Association of Securities Dealers. Barry Winograd, the

PricewaterhouseCoopers partner in charge of the account, reportedly informed the Board that he

might not be able to provide an unqualified opinion on AIG's annual financial report, scheduled

to be filed soon. It was decided that Greenberg would have to retire as CEO immediately, and

that Greenberg would remain as AIG's Chairman until at least the annual shareholder meeting in

May 2005.

96.     The next day, Monday, March 14, 2005, Greenberg retired as CEO. AIG issued a

press release announcing that the AIG Board had implemented its "management succession plan"

and that Martin J. Sullivan would succeed defendant Greenberg as President and Chief Executive

Officer. According to the release, Greenberg would serve in the capacity of non-executive

Chairman. AIG also announced that Steven J. Bensinger had been elected Executive Vice President, Chief Financial Officer, Treasurer and Comptroller, succeeding defendant Smith as Chief Financial Officer "who has taken leave." In the press release, Sullivan stated, "We have an extremely strong business and our financial fundamentals remain intact."

97.     On Tuesday evening, March 15, 2005, the AIG directors met for dinner at the St. Regis Hotel in New York City. According to press reports, Greenberg did not speak with the other directors and didn't respond to their toasts to him, instead walking out of the room. The next day, Greenberg left for a 10-day trip to Asia.

98.     On Good Friday, March 25, 2005, the NYAG and SEC sent subpoenas to AIG executives, including Greenberg, requesting documents. According to press reports, that same day, an attorney for Greenberg and/or SICO supervised the removal of boxes of SICO documents out of a joint AIG/SICO office in Bermuda and into a van. As reported, AIG attorneys learned that an AIG employee had destroyed some computer records and tape recordings of business meetings.

99.     Over the Easter weekend, the NYAG office heard about the described "document caper." According to press reports, Attorney General Spitzer informed AIG's outside counsel on Saturday night that AIG would be indicted on Monday if action was not taken. On Easter Sunday, AIG's outside counsel reportedly dispatched security guards from AIG corporate headquarters in New York to Bermuda, and the building was locked down.

100.    Greenberg's attorney faxed Greenberg's resignation letter the next day, Monday, March 28, 2005. That same day, AIG issued a press release entitled, "M. R. Greenberg To Retire From AIG." The press release stated that AIG's Board had received a letter from David Boies,

33

counsel for defendant Greenberg, indicating Greenberg's intent to retire from his position as

Chairman and that he would not stand for re-election to the Board at the AIG annual meeting.

### F.     The Accounting Fraud Is Finally Revealed To The Market

101.    On Wednesday, March 30, 2005, AIG issued a press release entitled, "AIG Delays

Form 10-K Filing To Complete Review," and in an extraordinary confession, admitted to a broad

range of improper accounting expected to slash AIG's net worth by up to $1.65 billion. AIG also

revealed that the filing of its 2004 Form 10-K would have to be delayed a second time, beyond

the March 31, 2005 extended due date, in order to complete a further review of AIG's books and

records related to issues arising from pending investigations by the NYAG and SEC. AIG

estimated that it would not be able to file its Form 10-K until April 30, 2005. The press release

stated, in pertinent part:

"The initial investigations related principally to an assumed reinsurance
transaction involving two tranches of $250 million each which took place in
December 2000 and March 2001 between an AID subsidiary and a subsidiary of
General Re Corporation ("Gen Re"). In connection with each tranche, each of
consolidated net premiums written and consolidated net loss reserves increased by
$250 million in each of the fourth quarter of 2000 and the first quarter of 2001.
The first tranche of the transaction was commuted in November 2004, which
reduced premiums and reserves for losses and loss expenses by approximately
$250 million in the fourth quarter 2004 previously reported unaudited financial
information. The second tranche remains on AIG's books as previously recorded.

***Based on its review to date, AID has concluded that the Gen Re transaction
documentation was improper and, in light of the lack of evidence of risk
transfer, these transactions should not have been recorded as insurance.
Therefore, AIG's financial statements will be adjusted to recharacterize such
transactions as deposits rather than as consolidated net premiums.*** The
recharacterization will have virtually no impact on AIG's financial condition as of
December 31, 2004, but will reduce the reserve for losses and loss expenses by
$250 million and increase other liabilities by $245 million.

In preparation for the issuance of the Form 10-K, management reviewed the
accounting treatment for certain ***additional items*** with its independent
accountants. Some of these matters were subsequently disclosed by AIG to
various federal and state law enforcement and regulatory authorities. ***The***

34

*continuing review has led AIG management to conclude that the accounting for certain of these matters may need to be recharacterized or otherwise adjusted. Certain but not all of the original characterizations resulted from transactions which appear to have been structured for the sole or primary purpose of accomplishing a desired accounting result.* The matters reviewed to date include:

**Union Excess**: AIG's general insurance company subsidiaries operate worldwide, primarily by underwriting and accepting risks for their direct clients and securing reinsurance on that portion of the risk in excess of the limit which they wish to retain. . . . AIG subsidiaries have also ceded business to Union Excess Reinsurance Company, Ltd. ("Union Excess") a Barbados-domiciled reinsurer. AIG has no direct equity interest in Union Excess. However, based upon AIG's review to date, including consideration of previously undisclosed facts, *AIG now believes that a significant portion of the ownership interests of Union Excess shareholders are protected under financial arrangements with Starr International Company, Inc.* ("SICO"), a private holding company which owns approximately 12 percent of AIG's outstanding common stock and whose board of directors consists of current and former members of AIG management. From its formation in 1991, Union Excess has reinsured risks emanating primarily or solely from AIG subsidiaries, both directly and indirectly. The transactions with Union Excess permitted AIG to reflect income arising from the discounting of reserves permitted under Barbados law. *If Union Excess is required to be treated as a consolidated entity by AIG, it would result in a maximum reduction of approximately $1.1 billion in AIG's consolidated shareholders' equity as of December 31, 2004, which represents the after-tax cumulative effect of the transactions with Union Excess over a 14 year period from 1991 to 2004.* . . .

**Richmond**: AIG subsidiaries have also ceded reinsurance to subsidiaries of Richmond Insurance Company, Ltd. ("Richmond"), a Bermuda-based reinsurance holding company in which AIG holds a 19.9 percent ownership interest. Although AIG owns only a minority ownership interest in Richmond, *the review of the operations of the Richmond subsidiaries has shown significant previously undisclosed evidence of AIG control. Therefore, AIG has determined that Richmond should be treated as a consolidated entity in AIG's financial statements. Consolidation of Richmond will result in a small increase in consolidated liabilities and a minimal impact on AIG's consolidated shareholders' equity as of December 31, 2004.*

**Capco**: The transactions with Capco Reinsurance Company, Ltd. ("Capco"), a Barbados domiciled reinsurer, involved an *improper structure created to recharacterize underwriting losses as capital losses. That structure, which consisted primarily of arrangements between subsidiaries of AIG and Capco, will require that Capco be treated as a consolidated entity in AIG's financial statements. The result of such consolidation is to recharacterize approximately*

35

*$200 million of previously reported capital losses as an equal amount of underwriting losses relating to auto warranty business from 2000 through 2003.*

**Covered Calls**: From 2001 to 2003, AIG entered into a series of transactions with third parties whereby AIG subsidiaries would sell in-the-money call options on bonds in their portfolios that had unrealized appreciation associated with them. *Through a series of forward transactions and swaps that allowed AIG to retain the bonds, AIG recognized net investment income in the amount of the unrealized gains. The cumulative increase in net investment income from these transactions was approximately $300 million with a corresponding decrease in realized capital gains over the three year period.* There was no effect on AIG's consolidated shareholders' equity.

**Receivables**: AIG continues to assess the recoverability of certain balances, consisting mainly of receivables in the domestic general insurance operations, to determine whether additional charges would be appropriate. *AIG currently believes that the after-tax impact of these charges would not exceed $300 million. . . .*

AIG is reviewing its prior estimates relating to *deferred acquisition costs* and certain other accruals and allowances with respect to AIG's general insurance and financial services subsidiaries to determine if adjustments are necessary. *These revisions could result in an aggregate after tax charge of approximately $370 million.*

AIG may reclassify certain items previously identified and reported as *net investment income.* The aggregate effect of the *misclassifications* AIG has identified to date was to *increase reported net investment income overt he period from 2000 through 2004 by approximately four percent.* The reclassification will have no effect on AIG's consolidated shareholders' equity as of December 31, 2004.

AIG has determined to change its accounting treatment to *expense the deferred compensation granted to certain AIG employees by SICO.* The magnitude of these amounts in prior years has been disclosed in the notes to AIG's audited financial statements, *but not included as expenses in the calculation of AIG's consolidated net income.* Although the expense will be a charge to reported earnings, the change will have no negative impact on shareholders' equity because an equal amount will be treated as deemed contributions from SICO to additional paid-in capital. . . ."

102.    Until March 30, 2005, the true facts disclosed in AIG's press release and further detailed in this Complaint were known by each of the defendants, but concealed from the investing public during the Class Period. As a result, AIG's prior reported financial condition,

36

including but not limited to its premiums, liabilities, reserves, revenue and income, were misstated in all of the press releases and public reports described above, as well as in all of the public SEC filings during the Class Period filed in coordination with such press releases.

103.    In response to news about AIG's misstatements, AIG's stock value plunged. Between February 14, 2005, when AIG first disclosed that it had received subpoenas from the SEC and NYAG, and April 1, 2005, after AIG startling admissions, AIG's share value fell approximately 30% or a total market value of over $60 billion.

104.    On Sunday, April 10, 2005, Attorney General Eliot Spitzer appeared on ABC-TV's "This Week With George Stephanopoulos" and said that Greenberg had misled the public about AIG's dealings, "That company was a black box run with an iron fist by a CEO who did not tell the truth. That is the problem. . . . We have powerful evidence, and will proceed with it. . . . The evidence is overwhelming that these were transactions created for the purpose of deceiving the market. We call that fraud. It is deceptive. It is wrong. It is illegal."

105.    On Monday, April 11, 2005, securities regulators interviewed Warren Buffett about the deal between AIG and General Re, a unit of Buffett's holding company, Berkshire Hathaway. According to the Associated Press, Joseph Fritsch, director of insurance accounting policy for the New York State Insurance Department, said that Buffet confirmed "that Hank [Greenberg] knew about the deal."

106.    On Tuesday, April 12, 2005, Greenberg appeared to be interviewed by government investigators but refused to answer questions and invoked the 5th Amendment to avoid self-incrimination. *That same day*, Greenberg filed a Form 4 with the SEC, revealing that on March 11, 2005, i.e., just three days after he was forced to resign as CEO, Greenberg gave his wife 41.4 million of his shares of AIG, representing 95 % of his personal stake. The gift was a

blatant attempt to shield his assets from lawsuits. The gift was valued at $2.68 billion on the day of the transaction.

107.    On May 1, 2005, AIG announced that it needed to restate its financial statements for the years ended December 31, 2003, 2002, 2001 and 2000, the quarters ended March 31, June 30, and September 30, 2004 and 2003, and the quarter ended December 31, 2003, and that its prior financial statements for those periods should no longer be relied upon. AIG also announced that its consolidated shareholders' equity would be reduced by approximately $2.7 billion – or $1 billion more than previously announced – due to accounting errors and internal control deficiencies.

108.    On May 11, 2005, the New York Times reported that three executives from General Re, John Houldworth, Elizabeth Monrad, and Richard Napier, had been notified by the SEC that civil fraud complaints would be filed against them relating to the sham transaction with AIG.

G.    **Violations of Accounting Rules**

109.    GAAP are recognized and used by the accounting profession in order to define acceptable accounting practices at a particular time. The SEC has also endorsed GAAP in Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which provides that financial statements filed both annually and quarterly with the SEC must comply with GAAP. If the filings do not comply with GAAP, they are presumed to be misleading and inaccurate, despite footnote or other disclosure. Therefore, defendants' misleading statements and omissions, described above, violated GAAP and SEC Regulations.

110.    Statements of Financial Accounting Standards ("FAS") are the highest authority in GAAP and are created by the Financial Accounting Standards Board. GAAP provides other

authoritative pronouncements, including Accounting Principles Board Opinions ("APB") and

Statements of Position ("SOP") of the American Institute of Certified Public Accountants

("AICPA").

111.    The responsibility for preparing financial statements that conform to GAAP rests

with corporate management, as set forth in Section 110.03 of the AICPA Professional Standards:

> "The financial statements are management's responsibility. Management is responsible
> for *adopting accounting policies and for establishing and maintaining internal control*,
> that will, among other things, record, process, summarize, and report transactions (as well
> as events and conditions) consistent with management's assertions embodied in the
> financial statements. The entity's transactions and the related assets, liabilities, and
> equity are within the direct knowledge and control of management . . . . Thus, the fair
> presentation of financial statements in conformity with [GAAP] is an implicit and integral
> part of management's responsibility."

112.    Pursuant to these requirements, AIG represented in its reports filed with the SEC

that its financial results were presented appropriately in accordance with GAAP. Nevertheless,

defendants knowingly disregarded the following fundamental GAAP when preparing its financial

statements:

(a)    Interim financial reporting should be based upon the same accounting principles

and practices used to prepare annual financial statements (APB No. 28, ¶ 10);

(b)    Financial reporting should provide information that is useful to present and

potential investors, creditors and other users in making rational, investment, credit and

similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

(c)    Financial reporting should provide information about the economic resources of

an enterprise, the claims to those resources, and matters that change such resources

(FASB Statement of Concepts No. 1, ¶ 40);

39

(d)     Financial reporting should provide information about how management of an enterprise has discharged it stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (FASB Statement of Concepts No. 1, ¶ 50);

(e)     Financial reporting should provide information about an enterprise's financial performance during a time period.  (FASB Statement of Concepts No. 1, ¶ 42).  This information is often used by investors and creditors in order to evaluate whether they are interested in future investment and credit offerings;

(f)     Financial reporting should be reliable and relevant in that it represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶ 58-59);

(g)     Financial reporting should be complete, in other words, all information that may be necessary to assure that it validly represents underlying events and conditions must be provided (FASB Statement of Concepts No. 2, ¶ 79); and

(h)     Financial reports should be conservative.  Preparers must adequately consider uncertainties and risks inherent in business situations and reflect those issues in the reports (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

113.     Throughout the Class Period, all the material misrepresentations and omissions particularized in this Complaint were disseminated and/or approved by defendants and those actions were a direct cause of the damages sustained by the plaintiffs and the Class.

114.     The transactions described above were nor properly accounted for, and AIG's financial statements during the Class Period were not prepared in accordance with GAAP.  Due to defendants' improper conduct, AIG has revealed that it will have to restate its materially misleading financial statements, filed with the SEC, which transactions impact AIG's Form 10-Ks and Form 10-Qs during the Class Period.  Based on regulations by the SEC and national stock

exchanges, the undisclosed information during the Class Period is the type investors and securities analysts expect to be disclosed.

## VI.    SCIENTER ALLEGATIONS

115.    As members of AIG's top management, including officers and/or directors, the Individual Defendants directly participated in the management of AIG and were directly involved in AIG's daily operations.  Defendants had access to confidential information concerning AIG and its business and operations, and personally participated in AIG's reported financial statements and financial condition.  Defendants knowingly permitted the false and misleading statements to be issued about AIG, and deliberately disregarded any attempt to revise them or correct the public market's perception about AIG.

116.    Because of their positions with AIG and/or General Re, defendants had access to the adverse undisclosed information about AIG's business and financial condition, knowingly or deliberately disregarding the fact that adverse information rendered the representations made during the Class Period materially false and misleading.  Defendants were personally familiar with the nature of the transactions and corporate structures described herein, and the false accounting for the transactions and structures, and personally negotiated some of the deals and monitored AIG's accounting for them through reports from AIG's management, the Finance Department, and professional accountants and auditors retained by AIG.  As a result of this information, defendants were aware that AIG was not properly accounting for the transactions and structures and, as a result, its financials were not fairly reported.

41

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT

### AND RULE 10b-5 PROMULGATED THEREUNDER

### (AGAINST ALL DEFENDANTS)

117.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

118.    This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j.

119.    During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including plaintiffs and other Class members, as alleged herein and caused plaintiffs and other members of the Class to purchase AIG shares or interests at distorted prices that they would not have paid had they known of the improper conduct alleged herein.  In furtherance of this improper scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

120.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of AIG securities, including plaintiffs and other members of the Class, in an effort to artificially inflate AIG's market condition and stock value and enrich themselves through their personal holdings of AIG stock, in violation of

42

Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

121.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG' operations, as specified herein.

122.    Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to improperly manipulate and profit and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon plaintiffs and members of the Class.

123.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

124.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of AIG securities were distorted during the Class Period such that they did not reflect the continuing course of conduct alleged herein. In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of

the Class acquired the shares or interests in AIG during the Class Period at distorted prices and were damaged thereby when the value of their shares fell after the truth became known, representing the causal connection between defendants' fraud and plaintiffs' damages.

125.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and other members of the Class and the marketplace known of the truth concerning the AIG operations, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period, they would not have done so at the distorted prices which they paid.

126.    By virtue of the foregoing, defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## SECOND CAUSE OF ACTION

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

## (AGAINST DEFENDANTS C.V. STARR & CO., INC., STARR INTERNATIONAL INC., MAURICE GREENBERG, HOWARD SMITH, CHRISTIAN MILTON, and L. MICHAEL MURPHY)

127.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

128.    This claim is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

129.    It is appropriate to treat the defendants named herein as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information

44

conveyed in the AIG public filings, press releases and other publications are the collective
actions of such defendants.

130.    The defendants named herein acted as controlling persons of AIG within the
meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their
operational and management control of AIG's respective businesses and systematic involvement
in the fraudulent scheme alleged herein, defendants named herein each had the power to
influence and control and did influence and control, directly or indirectly, the decision-making
and actions of AIG, including the content and dissemination of the various statements which
plaintiffs contend are false and misleading.   Each of the defendants named herein had the ability
to prevent the issuance of the statements alleged to be false and misleading or cause such
statements to be corrected.

131.    Each of the defendants named herein had direct and supervisory involvement in
the operations of AIG and, therefore, is presumed to have had the power to control or influence
the particular transactions giving rise to the securities violations as alleged herein, and exercised
the same.

132.    Each of the defendants named herein, by virtue of their stock ownership,
high-level positions, and participation in and/or awareness of AIG's operations, had the power to
influence and control and did influence and control, directly or indirectly, the decision-making of
AIG, including the content and dissemination of the various statements that plaintiffs contends
are false and misleading.  Defendants were provided with or had unlimited access to copies of
AIG's reports, press releases, public filings and other statements alleged by plaintiffs to be
misleading prior to and/or shortly after these statements were issued and had the ability to

prevent the issuance of the statements or cause the statements to be corrected. AIG controlled these defendants and all of its employees.

133.   As set forth above, each of the defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, each of the defendants named herein is also liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of AIG securities during the Class Period at inflated prices and the losses suffered when the value of their shares fell after the truth became known, representing the causal connection between defendants' fraud and plaintiff's damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and the Class, pray for judgment as follows:

1.   Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.   Awarding plaintiff and all members of the Class damages against all defendants, jointly and severally, in an amount to be proven at trial;

3.   Awarding plaintiff and members of the Class appropriate equitable relief;

4.   Awarding plaintiff and members of the Class pre-judgment interest, as well as reasonable attorneys' fees and other costs;

5.    Awarding such other relief as this Court may deem just and proper.

Dated: May 12, 2005

**COTCHETT, PITRE, SIMON & McCARTHY**

By: _____

STEVEN N. WILLIAMS (SW-6198)
JOSEPH W. COTCHETT
BRUCE L. SIMON
NANCY L. FINEMAN
MARK C. MOLUMPHY
840 Malcolm Road, Suite 200
Burlingame, California 94010
Phone: (650) 697-6000
Fax: (650) 697-0577

DENNIS J. HERRERA
City Attorney
DAN MAGUIRE
OWEN J. CLEMENTS
Deputy City Attorneys
**OFFICE OF THE CITY ATTORNEY**
1390 Market Street, 5th Floor
San Francisco, CA 94102-5408
Phone: (415) 554-3800
Fax: (415) 554-3837

GEOFFREY SPELLBERG
**MEYERS, NAVE, RIBACK, SILVER & WILSON**
180 Montgomery Street, Suite 2200
San Francisco, California 94104
Phone: (415) 421-3711
Fax: (415) 421-3767

STANLEY GROSSMAN (SG-4544)
**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**
100 Park Avenue
New York, NY 10017
Phone: (212) 661-1100
Fax: (212) 661-8665

*Attorneys for Plaintiff and the Class*

47

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, plaintiff individually and on behalf of all others similarly situated demands a jury trial of all issues subject to adjudication by a trier of fact.

Dated: May *12*, 2005

COTCHETT, PITRE, SIMON & McCARTHY

By: _____

STEVEN N. WILLIAMS (SW-6198)
JOSEPH W. COTCHETT
BRUCE L. SIMON
NANCY L. FINEMAN
MARK C. MOLUMPHY
840 Malcolm Road, Suite 200
Burlingame, California 94010
Phone: (650) 697-6000
Fax: (650) 697-0577

DENNIS J. HERRERA
City Attorney
DAN MAGUIRE
OWEN J. CLEMENTS
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY
1390 Market Street, 5th Floor
San Francisco, CA 94102-5408
Phone: (415) 554-3800
Fax: (415) 554-3837

GEOFFREY SPELLBERG
MEYERS, NAVE, RIBACK, SILVER & WILSON
180 Montgomery Street, Suite 2200
San Francisco, California 94104
Phone: (415) 421-3711
Fax: (415) 421-3767

STANLEY GROSSMAN (SG-4544)
POMERANTZ HAUDEK BLOCK GROSSMAN &
GROSS LLP
100 Park Avenue
New York, NY 10017
Phone: (212) 661-1100
Fax: (212) 661-8665

*Attorneys for Plaintiff and the Class*